# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

**ROXANNE L. SUSALLA,**        )
                                 )
     **Plaintiff,**             )
                                 )
     **v.**                    )     **CAUSE NO. 1:11-CV-00164**
                                 )
**MICHAEL J. ASTRUE,**         )
**Commissioner of Social Security,**    )
                               )
     **Defendant.**          )

## OPINION AND ORDER

Plaintiff Roxanne Susalla appeals to the district court from a final decision of the
Commissioner of Social Security ("Commissioner") denying her application under the Social
Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the
Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Susalla applied for DIB and SSI in August 2008, alleging disability as of December 9,
2006, which she later amended to April 8, 2008. (Tr. 15, 149-55.) The Commissioner denied her
application initially and upon reconsideration, and Susalla requested an administrative hearing.
(Tr. 90-116.) On April 27, 2010, a hearing was conducted by Administrative Law Judge
("ALJ") John Pope, at which Susalla (who was represented by counsel), her stepmother, and a
vocational expert ("VE") testified. (Tr. 34-85.) On June 10, 2010, the ALJ rendered an

---

[1] All parties have consented to the Magistrate Judge. (Docket # 12); *see* 28 U.S.C. § 636(c).

unfavorable decision to Susalla, concluding that she was not disabled because she could perform a significant number of unskilled sedentary jobs in the economy. (Tr. 15-26.)  The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-4, 10-11.)

Susalla filed a complaint with this Court on May 18, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  In his appeal, Susalla advances two arguments: (1) that the ALJ erred by failing to incorporate his step-three finding that Susalla had moderate deficits in concentration, persistence, or pace into the RFC and the hypothetical posed to the VE at step five; and (2) that the ALJ improperly evaluated the opinion of Dr. Kalapatapu, her treating psychiatrist. (Docket # 20.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Susalla was forty-two years old; had obtained her GED and attended a year and a half of college; and possessed work experience as a billing clerk, housekeeping cleaner, Checker II, and waitress. (Tr. 15, 40, 149, 185, 245.)  Susalla alleges that she is disabled due to bilateral hip dysplasia with left hip replacement in 2002, major depressive disorder, generalized anxiety disorder, GERD, irritable bowel syndrome, and pain in her neck, hands, knees, low back, and feet. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 2.)  Susalla does not challenge the ALJ's findings with respect to her physical conditions; therefore, the Court will focus on the evidence pertaining to her mental limitations.

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 902-page administrative record necessary to the decision.

At the hearing, Susalla testified that she lives in a mobile home with her two children, ages ten and thirteen; she is able to perform her self care independently. (Tr. 40, 50, 56-57, 59.) She drives a car (Tr. 59), but her stepmother helps her two to three times a week with grocery shopping, meal preparation, vacuuming, and yard work (Tr. 50, 62). Her typical day includes helping her children get ready for school; performing household tasks, including laundry, preparing meals, and doing dishes; lying on the couch and sleeping or watching television; and helping her children with homework. (Tr. 47-50, 61.) She said that she intersperses household activities with periods of rest. (Tr. 61.)

Susalla testified that she has depression and anxiety, panic attacks, concentration and memory difficulties, and irritability. (Tr. 50-51, 54, 60, 63-67.) She attended counseling for about a year, but did not find it helpful and was discharged because she missed too many appointments. (Tr. 52-53.) She also stated that she suffers from migraine headaches several times a week, which cause her to recline in the dark for two hours. (Tr. 58.) As to her physical conditions, Susalla represented that she suffers from constant pain in her neck, shoulders, back, legs, ankles, feet, and hands. (Tr. 54-55, 57, 60.) She takes a variety of medication for her conditions, which cause her to feel tired and forgetful.[3] (Tr. 47, 55.)

*B. Summary of the Relevant Medical Evidence*

In August 2008, Dr. U. Kalapatapu, a psychiatrist, evaluated Susalla. (Tr. 615-18.) He found that she was coherent, relevant, and goal directed in her conversation; had connected and logical thought processes; intact memory; and average intelligence. (Tr. 616.) He diagnosed her

---

[3] Susalla's stepmother also testified at the hearing and essentially corroborated Susalla's testimony. (Tr. 70-75.)

with major depressive disorder, recurrent episode, severe, without mention of psychotic

behavior; anxiety disorder, generalized; and Bulimia nervosa. (Tr. 616.) He rated her current

and highest-past-year Global Assessment of Functioning ("GAF") score at 50.[4] (Tr. 616.)

Susalla saw Dr. Kalapatapu nine more times from September 2008 to October 2009 for

medication management; during that period, he, for the most part, simply documented that she

was "doing well" or "very well" with her current medications. (Tr. 611-14, 742-48, 841, 843.)

On September 4, 2008, Candace Martin, Psy.D., performed a mental status examination.

(Tr. 565-69.) She found Susalla's attention and concentration were somewhat limited, her

memory and math calculation skills weak, and that sometimes she was unable to answer even

simple questions. (Tr. 566-68.) Her mood was characteristic of discouragement and some

performance anxiety, but her social skills were adequate. (Tr. 566.) Dr. Martin thought that

Susalla was overwhelmed with her numerous physical problems and that they were the "primary

interference" with her ability to work. (Tr. 568.) Dr. Martin concluded that Susalla might have

difficulty with sustained concentration and persistence, demand for quick learning and

demonstration of strong cognitive skills and memory skills, and accurate performance of math

calculation skills. (Tr. 568.) She assigned Susalla a GAF score of 35 and diagnosed her with

major depressive disorder, recurrent; adjustment disorder with mixed anxiety and depressed

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

mood; polysubstance dependence, in remission for ten years; and cognitive disorder NOS. (Tr. 568.)

On October 20, 2008, Maura Clark, Ph.D., a state agency psychologist, reviewed Susalla's record and found that she had a mild limitation in daily living activities and a moderate degree of limitation in maintaining social functioning and concentration, persistence, or pace. (Tr. 800-13.) She further indicated that Susalla was moderately limited in several work-related mental activities, including the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistence pace without an unreasonable number of rest periods. (Tr. 588-91.) Dr. Clark concluded that Susalla had the mental capacity to understand, remember, and follow simple instructions; was restricted to work that involves brief, superficial interactions with fellow workers, supervisors, and the public; and within those parameters was able to perform simple, routine, repetitive, concrete, tangible tasks and sustain attention and concentration with reasonable pace and persistence to the extent her physical condition permits. (Tr. 591.)

In May 2009, Dr. Kalapatapu completed a medical source statement, checking the box for the following signs and symptoms: appetite disturbance, decreased energy, feelings of guilt and worthlessness, generalized persistent anxiety, mood disorder, difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional withdrawal or isolation, emotional lability, and easy distractability. (Tr. 815-19.) He found that she had no useful ability to maintain regular attendance and be punctual, complete a normal workday and work week without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number of rest periods, and deal with work stress. (Tr. 817-18.) He

further opined that she would miss more than four days a month due to her mental impairments. (Tr. 819.)

In June 2009, Susalla was evaluated by mental health counselor Teddie Ramsey. (Tr. 836-39.) He found the following symptoms on mental status exam: tense and fidgety behavior; pressured thoughts; a mood that was dysphoric, fearful, angry, anxious, hopeless, and helpless; a flat, labile, and tearful affect; and fair judgment. (Tr. 838.) He diagnosed her with a major depressive disorder and an obsessive compulsive disorder and assigned her a current GAF of 54 with a highest-past-year GAF of 58. (Tr. 839, 849.) He found that her severe chronic pain compounded her mental health issues. (Tr. 849.) Susalla continued to see Mr. Ramsey for counseling until January 2010. (Tr. 827-35, 870.)

In February 2010, Susalla was evaluated by Dr. Valsa Ouseph, a psychiatrist. (Tr. 867-69.) On mental status exam, she was very concerned about her current financial problems; her affect was restricted; and her mood was dysphoric. (Tr. 868.) He noted her various medical problems, which he thought were "mostly related to her fibromyalgia," and that her "pressing problems are her financial difficulties," and diagnosed her with major depression; he assigned her a current GAF of 55. (Tr. 867-68.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 10, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 15-26.) He found at step one of the five-step analysis that Susalla had not engaged in substantial gainful activity since her amended alleged onset date and at step two that she had the following severe impairments: degenerative disk disease, fibromyalgia, right hip dysplasia, status post left hip replacement, arthritis, headaches, depression, anxiety, and post traumatic stress disorder. (Tr. 17.) At step three, the ALJ determined that Susalla's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 18-19.)

Before proceeding to step four, the ALJ determined that Susalla's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

> [T]he claimant has the residual functional capacity to perform sedentary work . . . except should never climb ladders, ropes, or scaffolds; should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and is limited to unskilled work involving no more than brief, superficial interactions with co-workers, supervisors, and the public.

(Tr. 19-20.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Susalla was unable to perform any of her past relevant work. (Tr. 24.)  The ALJ then concluded at step five that she could perform a significant number of unskilled sedentary jobs within the economy, including information clerk, taper, and hand packager. (Tr. 25.)  Accordingly, Susalla's claims for DIB and SSI were denied. (Tr. 26.)

### C. The ALJ Adequately Incorporated His Finding That Susalla Had a Moderate Deficiency in Her Ability to Maintain Concentration, Persistence, or Pace Into the RFC and Hypothetical Posed to the VE at Step Five

Susalla first argues that the ALJ erred when assigning her RFC and posing a hypothetical to the VE at step five, maintaining that the ALJ failed to include his earlier finding that she had moderate deficiencies in concentration, persistence, or pace.  Susalla's argument, however, does not warrant a remand of the Commissioner's final decision.

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairment(s) are "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  In determining the severity of a claimant's mental impairments at step two of his five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416a.920(a)(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).

9

The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "t[ook] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, and pace); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at 543 (emphasis added).

At step three, the ALJ found that Susalla had moderate difficulties in maintaining concentration, persistence, or pace, as well as moderate difficulties in maintaining social functioning. (Tr. 18-19.) After determining that Susalla's mental impairments were significant enough to be "severe" but not severe enough to meet a listing-level impairment, the ALJ assigned her a RFC limiting her to "unskilled work involving no more than brief, superficial interactions with co-workers, supervisors, and the public." (Tr. 19-20.)

In assigning the RFC for unskilled work, the ALJ relied upon the opinion of Dr. Clark, the state agency psychologist, who reviewed Susalla's record and concluded that although she had moderate difficulties in maintaining concentration, persistence, or pace, she could still perform work involving "simple tasks and . . . superficial, casual interactions with others." (Tr. 588-91.) Dr. Clark further elaborated:

> Claimant has the mental capacity to understand, remember, and follow simple instructions. Cl[aiman]t is restricted to work that involves brief, superficial interactions w/fellow workers, supervisors and the public. Within these parameters and in the context of performing simple, routine, repetitive, concrete,

tangible tasks, cl[aiman]t is able to sustain attention and concentration skills to carry out work like tasks with reasonable pace and persistence to the extent her physical condition permits.

(Tr. 591.)

The Seventh Circuit has held that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *See, e.g.*, *Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming the ALJ's RFC of "unskilled work" where a physician translated his findings concerning claimant's deficits in concentration, persistence, or pace into a restriction of unskilled work); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work"); *see also Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ's limitation of plaintiff to work that is "routine and low stress" as recommended by one medical source of record adequately accounted for the fact that plaintiff often suffered from deficiencies in concentration, persistence, or pace).

Susalla argues, however, that the ALJ's RFC is not supported by substantial evidence

because it does not reflect Dr. Clark's specific translation of her clinical findings—that is, a RFC limiting her to "simple, routine, repetitive, concrete, tangible tasks." (Tr. 591.)  Indeed, some courts have stated that "[o]nly if a doctor used the descriptive language to describe what work a claimant can perform in spite of [her] limitations can the ALJ use those terms in the RFC or hypothetical questions the VE." *Coots v. Astrue*, No. 08-cv-2197, 2009 WL 3097433, at *8 (C.D. Ill. Sept. 22, 2009) (citing *Johansen*, 314 F.3d at 289); *see also Conley v. Astrue*, 692 F. Supp. 2d 1004, 1008-09 (C.D. Ill. 2010).  And, the Seventh Circuit has found a hypothetical flawed where it "purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform." *Young v. Barnhart*, 362 F.3d 995, 1004 n.4 (7th Cir. 2004); *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Everroad v. Astrue*, No. 4:06-cv-100, 2007 WL 2363375, at *8 (S.D. Ind. Aug. 10, 2007) ("By using conclusory language to describe [the claimant's] limitations, the ALJ did not allow the expert to make a reliable determination about what work the claimant could perform.").

Although it would have been most prudent for the ALJ to mirror Dr. Clark's translation with specificity, in this particular instance the ALJ's RFC for "unskilled work" is adequately supported by the record.  "Unskilled work" is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a); *see Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011).  The Social Security Administration further articulated that the following mental activities are generally required to perform unskilled work: understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled

work (i.e., simple work-related decisions); responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374186, at *9; *see Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("[W]here the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then an RFC of 'unskilled' work would be appropriate.").

Here, the opinion of Dr. Clark, to which the ALJ assigned "great weight" (Tr. 24), specifically addressed Susalla's limitations with respect to these mental activities. Dr. Clark opined that Susalla "has the mental capacity to understand, remember, and follow simple instructions"; was "not significantly limited" in her ability to make simple work-related decisions, respond appropriately to criticism from supervisors, get along with coworkers, or request assistance; and was "moderately limited" in her ability to respond appropriately to changes in the work setting. (Tr. 588-91.)

Dr. Clark also emphasized that despite her impairments, Susalla was performing a wide range of activities, including supervising children, overseeing homework, preparing simple meals, driving, shopping, and managing money, and that the limitations she experienced when performing those activities were primarily attributable to her physical complaints. (Tr. 590.) The ALJ observed that Dr. Martin, a consulting examiner, reached the same conclusion, articulating that Susalla's physical limitations were her "primary difficulty in relation to her employability."[6] (Tr. 19, 568.) To reiterate, Susalla does not challenge the ALJ's findings with respect to her

---

[6] In addition to limiting her to unskilled work, the ALJ also assigned Susalla a limitation that she work only in jobs "involving no more than brief, superficial interactions with co-workers, supervisors, and the public," thereby also taking into account his earlier finding that Susalla had moderate difficulties in maintaining social functioning.

physical limitations. In addition, the ALJ stressed that Susalla could not provide any actual examples of how or when her attention and concentration problems interfered with her activities (Tr. 21, 54), that her psychological treatment had been relatively "sparse and cursory" (Tr. 22), and that another evaluating psychiatrist, Dr. Ouseph, found her cognitive functions and thought processes "intact" (Tr. 19, 868).

To reiterate, "an ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))). Because Dr. Clark translated Susalla's moderate deficits in concentration, persistence, or pace into a RFC that reflected the capacity to perform the mental activities identified by the Social Security Administration for "unskilled work," substantial evidence supports the ALJ's step-five finding. *See, e.g.*, *Karger v. Astrue*, 566 F. Supp. 2d 897, 909 (W.D. Wis. 2008) (affirming ALJ's decision where the record indicated that the claimant had the prerequisite mental abilities necessary to perform "unskilled" work); *Orucevic v. Astrue*, No. C07-1981 CRD, 2008 WL 4621420, at *7 (W.D. Wash. Oct. 16, 2008) (affirming the ALJ's decision limiting the claimant to "unskilled" work where the record indicated she could perform "simple, repetitive tasks," observing that the Social Security Administration's definition of "unskilled" work "describes repetitive tasks as the primary work duty"). Therefore, Susalla's first argument—that the RFC and the hypothetical posed to the ALJ at step five did not account for her moderate deficits in concentration, persistence, or pace—does

not warrant a remand of the Commissioner's final decision.

### D. The ALJ's Consideration of Dr. Kalapatapu's Opinion
### Is Supported by Substantial Evidence

Susalla next challenges the ALJ's discounting of the opinion of Dr. Kalapatapu, her treating psychiatrist, indicating that she would miss more than four days of work per month due to her mental impairments. (Tr. 819.) Susalla emphasizes that this is significant because the VE testified that an individual cannot maintain competitive employment if she is absent from work more than one-and-a-half days per month. (Tr. 80.) As with her first argument, Susalla's second argument does not require a remand of the Commissioner's final decision.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen*, 314 F.3d at 287; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see Moss v. Astrue*, 555 F.3d 556, 561

15

(7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB or SSI simply because her treating physician states that she is "unable to work" or "disabled"; the determination of disability is reserved to the Commissioner. *Clifford*, 227 F.3d at 870; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ discussed the medical records from Dr. Kalapatapu, Susalla's treating psychiatrist from August 2008 to October 2009. (Tr. 22.) He noted that Dr. Kalapatapu found in his initial evaluation that Susalla's thought processes were connected and logical; that her conversation was coherent, relevant, and goal-directed; that she appeared to have average intelligence; and that her memory was intact. (Tr. 22, 615-17.) He also observed that Dr. Kalapatapu assigned Susalla a GAF score of 50. (Tr. 22.) The ALJ then considered the mental residual functional capacity questionnaire completed by Dr. Kalapatapu in May 2009, indicating, among other things, that Susalla had "serious" limitations in remembering work-like procedures and setting realistic goals and would likely miss more than four days of work per month due to her impairments. (Tr. 23, 815-19.)

The ALJ, however, ultimately chose to assign "little weight" to Dr. Kalapatapu's opinion proffering such severe limitations. (Tr. 23.) He first observed that, overall, Susalla's psychological treatment had been rather "sparse and cursory." (Tr. 22.) More specifically, he noted that Dr. Kalapatapu had only been treating Susalla for one year and that his fifteen-minute

16

appointments with Susalla were primarily focused on medication assessments. (Tr. 23.) The ALJ next pointed out that Dr. Kalapatapu's May 2009 opinion was a "predominately standard fill in the blank questionnaire[] without much support in the form of narrative or treatment history," appearing to rely more on Susalla's subjective reports than objective evidence. (Tr. 23.) And finally, the ALJ noted a treating physician may bring bias to a disability evaluation, wanting to do a favor for his patient. (Tr. 23.)

Susalla contends, however, that these reasons provided by the ALJ were not "good reasons" for discounting Dr. Kalapatapu's opinion. More particularly, she complains that the ALJ did not provide "specific examples" of how Dr. Kalapatapu was biased or "explain why the length and frequency of treatment in the instant case is a negative factor." (Opening Br. 23.) She also contends that although Dr. Kalapatapu provided a checklist form, his August 2008 evaluation took an "extensive" history and his mental residual functional capacity questionnaire was supported by clinical signs and symptoms, including decreased energy, feelings of guilt, persistent anxiety, difficulty thinking, emotional lability, and easy distractability. (Opening Br. 24.) In addition, Susalla suggests that the ALJ erred by failing to consider Dr. Kalapatapu's expertise as a psychiatrist when weighing his opinion in accordance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). (Opening Br. 24.)

The ALJ's consideration of Dr. Kalapatapu's opinion is supported by substantial evidence, even though it is less than perfect in one respect. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). As to the ALJ's discounting of Dr. Kalapatapu's opinion

based on the frequency of his visits with Susalla, there is no indication that the fifteen-minute, monthly visits for medication management were inconsistent with the "frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [her] medical condition(s)." 20 C.F.R. §§ 404.1502, 416.902; *see Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1006 (N.D. Ill. 2010). Therefore, the ALJ's reasoning in that respect is lacking. Nevertheless, because the ALJ provided several other "good reasons" to discount Dr. Kalapatapu's opinion, this misstep falls short of warranting a remand of the ALJ's decision.

To explain, the ALJ was entitled to consider the relatively short duration of Susalla's treatment relationship with Dr. Kalapatapu. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."), (ii) ("We will look at the treatment the source has provided . . . ."). Dr. Kalapatapu had treated Susalla just nine months when he rendered his May 2009 opinion describing severe limitations. *Cf. Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("The advantage that a treating physician has over other physicians whose reports might figure in a disability case is that he has spent more time with the claimant."). In that same vein, the ALJ observed that Susalla's psychological treatment was rather "sparse and cursory" overall. *See generally Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (considering that claimant's treatment was "relatively conservative" when affirming the ALJ's decision).

Furthermore, the ALJ noted that Dr. Kalapatapu simply checked ten boxes on a one-page, fifty-box questionnaire listing "signs and symptoms," but did not provide much support in the form of a narrative summary or treatment history. It is not unreasonable for an ALJ to discount a

physician's opinion where he "expressed this opinion by writing 'yes' next to a question that [the claimant's] attorney had pre-typed," but did not elaborate on the basis for this opinion. *Dixon*, 270 F.3d at 1177; *see Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (unpublished) ("[A]lthough the form [the physician] used had space for particular medical or clinical findings supporting his assessment, he identified no such findings. This suggests that his assessment was based solely on [the claimant's] subjective complaints of pain and discomfort.").

Moreover, although Susalla touts the purported "extensive" history taken by Dr. Kalapatapu in his initial evaluation as support for his May 2009 findings, this history primarily reflects Susalla's subjective report of her symptoms and limitations. And, there is no other record of any other psychiatric evaluation or objective testing by Dr. Kalapatapu—only brief monthly notes for medication management that reflected, for the most part, that she was "doing well" or "very well" with her medications. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (discounting a treating physician's opinion where his conclusions about the claimant's limitations were based almost entirely on the claimant's "subjective complaints rather than objective evidence"); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

And, as to his comment that Dr. Kalapatapu had potential for bias as a treating physician, the ALJ made this statement in the context of observing that Dr. Kalapatapu's May 2009 opinion was inconsistent with other material evidence of record. Specifically, the ALJ stated: "While it is difficult to confirm such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, *as in the current case*."

(Tr. 23 (emphasis added).)  Thus, in effect, the ALJ found that Dr. Kalapatapu's opinion proffering severe psychological limitations was inconsistent with other significant evidence of record (such as, the Court observes, the opinions of Dr. Clark, Dr. Martin, and Dr. Ouseph, and Dr. Kalapatapu's own treatment notes).  Of course, "if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Murphy v. Astrue*, 454 F. App'x 514, 519 (7th Cir. 2012) (unpublished) (quoting *Ketelboeter*, 550 F.3d at 625).

Moreover, the Seventh Circuit has articulated that "an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims." *Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009) (unpublished) (citations omitted); *see Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006) ("[T]he fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits." (citations omitted)); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985))).  As such, "all but the most patently erroneous assessments of a treating physician's bias" are upheld. *Labonne*, 341 F. App's at 225 (citing *Dixon*, 270 F.3d at 1177).

Finally, even though he did not always mention Dr. Kalapatapu by name, the ALJ did indeed note in his decision (three times, no less) that Susalla's treating mental health source was

a psychiatrist in accordance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). (*See, e.g.*, Tr. 21 ("The claimant indicated that she has been visiting a psychiatrist at the Raj Clinic. . . . The claimant's treating psychiatrist reported in March 2009 that the claimant was not experiencing any side effects from her medication."), 23 ("As for the claimant's psychiatrist . . . .").) In any event, even if he had not, an ALJ need not articulate "an exhaustive factor-by-factor analysis." *Brown v. Astrue*, No. 1:10-cv-450, 2011 WL 5102276, at *11 (N.D. Ind. Oct. 27, 2011) (citations omitted). "Rather, the ALJ must sufficiently articulate [his] assessment of the evidence to assure the court that [he] considered the important evidence and to enable the court to trace the path of [his] reasoning." *Id*. (citation omitted). Therefore, Susalla's argument that the ALJ failed to consider Dr. Kalapatapu's specialty is particularly baseless.

In sum, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Micus*, 979 F.2d at 608 (citing *Stephens*, 766 F.2d at 288). The ALJ's decision to discount Dr. Kalapatapu's opinion, which lacked objective support and was inconsistent with other material evidence of record, is supported by substantial evidence.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Susalla.

SO ORDERED.

Enter for this 5th day of June, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
